Julius Denny, Appellee, v. Edward C. Dorr and William Gernis, Trading as Harrison Tavern, Appellants.

Gen. No. 10,208.

Opinion filed March 9, 1948.

Released for publication March 30, 1948.

JAMES BERRY and THOMAS SIMMONS, both of Rockford, for appellants.

B. Jay Knight, Frederick H. Haye and Thomas A. Keegan, all of Rockford, for appellee.

Mr. Presiding Justice Wolfe delivered the opinion of the court.

Julius Denny, the plaintiff, a negro, secured a verdict and judgment .against the defendants, Dorr and Gernis, for $300 under the Civil Rights Act, on his complaint and testimony that the defendants on December 7 and 9, 1946, and on January 24, 1947, refused on account of his race and color, to sell to him beer, by the glass, as a customer of the defendants' tavern near Rockford. The defendants prosecute this appeal.

Section one of the Civil Rights Act provides, that all persons within the jurisdiction of the State of Illinois, shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities and privileges of public accommodation and amusement, of . . . taverns and roadhouses . . . subject only to the conditions and limitations established by law and applicable to all citizens.

Section two of the same Act provides, that any person who shall violate any of the provisions of the foregoing section denying to any citizen, except for reasons applicable alike to all citizens of every race and color, and regardless of color or race, the full enjoyment of any accommodations, advantages, facilities or privileges in said section enumerated, or by aiding or inciting such denial, shall for every such offense, forfeit and pay a sum not less than twenty-five dollars nor more than five hundred dollars to the person aggrieved thereby, to be recovered in any court of competent jurisdiction, in the county where said offense was committed. (Chap. 38, par. 125, Ill. Rev. Stat. 1947 [Jones Ill. Stats. Ann. 22.01].)

Section 12b of the Liquor Control Act provides as follows: "No licensee under the provisions of this

Act shall deny or permit his agents and employees to deny any person the full and equal enjoyment of the accommodations, advantages, facilities and privileges of any premises in which alcoholic liquors are authorized to be sold subject only to the conditions and limitations established by law and applicable alike to all citizens.''

The answer of the defendants denied the charge of the complaint that the plaintiff was denied the privilege of buying beer by the glass in the tavern of the defendants because of his race or color. The seventh paragraph of the answer is as follows:—''The defendants state the fact to be that the plaintiff has been served on innumerable occasions at their tavern, glasses of beer and glasses of whiskey. They state the fact to be that on one occasion the plaintiff was denied the right to make any purchase of any kind, because he asked that he be extended credit for the purchase price of a bottle of liquor. On one other occasion he was denied service, because he appeared to be intoxicated, because he used vile and vulgar language toward the defendant, William Gernis, and because he threatened the defendant, William Gernis.'' The plaintiff did not file a reply to the answer of the defendants.

At the close of the plaintiff's evidence, the defendants made a motion for a directed verdict, which was overruled. The defendants thereupon introduced their evidence in support of the affirmative defenses set up in their answer. The defendants now contend that the affirmative defenses set up in their answer are admitted, because not replied to by the plaintiff. The failure to file a reply does not constitute an admission of well-pleaded facts set forth in an answer where the defendants, after the denial of their motion for a finding in their favor at the close of the plaintiff's case, introduced evidence on all issues set up in

the answer, including affirmative defenses, as in such case the failure to file a reply is waived. (*Cienki v. Rusnak,* 398 Ill. 77.)

During the time in question, the tavern was being operated by the defendants, William Gernis and Edward C. Dorr, as partners under the name of Harrison Street Tavern. The defendants employed as bartenders, Herbert Holm and Alexander Corbin. Holm lived above the tavern. His working hours were from six o'clock in the morning until two-thirty in the afternoon. Corbin relieved Holm at 2:30 p. m. and tended bar until fifteen minutes before closing time, at one o'clock a. m. One or both of the defendants were usually in the tavern during the day, and they interchanged time in being there after 6:30 o'clock p. m.

Plaintiff was employed as an instructor of moulders in the Liberty Foundries, located about three city blocks from the tavern. His working hours were from four o'clock in the afternoon until 2:30 in the morning, excepting on Saturdays when he worked from eight o'clock in the morning until 3:30 in the afternoon, and, after a rest period, returned to work until 7:30 or 8:00 o'clock p. m.

The defendants purchased the tavern on March 11, 1946, and began to operate it, as licensees, on April 27, 1946. The tavern is mostly patronized by white and colored persons who are employed in factories located near the tavern. It appears from the testimony of the plaintiff and other witnesses that white and colored persons, before and after the defendants became operators of the tavern, were served beer by the glass in the tavern. The defendants testified that their negro customers usually purchase beer by the bottle and drink it outside of the tavern, but that there is no requirement of the owners that they do so. The defendants testified that they never instructed their bartenders not to sell beer by the glass to negroes. The plaintiff testified that the bartenders and the defendant, Gernis, denied his request to serve him beer

by the glass, on account of his race and color, but offered to sell him beer by the bottle. This was denied by Gernis and the bartenders.

As will hereafter appear, the defendants introduced evidence tending to prove that they had good reasons, without regard to the race and color of the plaintiff, for denying to sell him liquor as a patron of the tavern. The question of fact whether or not the plaintiff was denied the right of buying beer by the glass in the tavern, because of his race and color came to the jury as a matter of the credibility of the witnesses on the side of the plaintiff and the witnesses testifying for the defendants.

The trial court overruled a motion for a new trial made by the defendants. It is contended here that the verdict is against the manifest weight of the evidence. A summary of the material elements of the evidence in the record is hereafter stated.

The plaintiff, Julius Denny, testified that on December 7, 1946, at about 7:30 o'clock in the morning, he entered the tavern of the defendants and asked the bartender, Holm, "May I have a glass of beer, please?" Holm replied, "No, you can't." Then Holm said, "You will have to see the boss, the orders are not to serve any colored people out of the glass." He pointed to the defendant, Gernis, who said, "No, I can't serve you a glass of beer." Then I went to Mr. Gernis and asked him if I could have a glass of beer, and he told me, "I can't serve you out of a glass, I will sell you a bottle of beer." I said, "I do not care for that much." I was alone that morning in the tavern, but there were other customers in the tavern at that time. On the morning of December 7, I got to bed about 3:30 and got up about 6:30 in the morning and went back to work. I had not been drinking that morning.

Plaintiff further testified: On December 9, 1946, about 6:00 o'clock in the afternoon, I went into the tavern with two other colored men, Earl Jackson and

LeRoy Hamilton. I asked the bartender if I could have a glass of beer; neither Gernis nor Dorr were there at that time. The bartender said, "No, I am sorry I can't serve colored people out of a glass." I am not sure if the bartender there at that time was Holm or Corbin, but I think he was Holm. The two men who went into the tavern with me on December 9, I took with me as witnesses, and I had some conversation with them before we went into the tavern. Before this trial, they left the State of Illinois. One is in California and the other in Arkansas.

Plaintiff further testified: On Friday, January 24, 1947, at about 3:45 p. m. I went into the tavern with Forrest Dahl and James Sands; I was working at the shop with them. We talked about going to the Harrison Avenue Tavern. I told them about my experience and asked them to be my witnesses. I went there at that time to find out if I could be served out of a glass as a matter of principle. "When I came there Mr. Gernis and Mr. Dorr and the older gentleman who just walked out," (evidently the bartender Corbin who had just left the courtroom,) "were all three behind the bar." Dahl and Sands got bottles of beer. I held up a half dollar and asked Mr. Gernis for a glass of beer. Mr. Gernis said, "I am sorry I can't serve you." He walked on and I left the tavern. The people along the bar were drinking draft and bottle beer.

Plaintiff further testified: When I was in the tavern on December 9 with two other colored gentlemen, people at the bar were drinking draft beer. On December 7 when I was there alone, some seven or eight people were in there; they were drinking draft and bottled beer. Where you order draft beer, you are ordering beer by the glass. I have seen Mr. Dorr there, and on the three occasions that I have told about, he was there. On January 24, 1947, I did not talk to him. He was standing close to Mike Michaelson at

the end of the bar. Michaelson is one of the bosses at the foundry. I was standing about six or eight feet from Dorr at the time I held up the money.

The plaintiff also testified: I have been served drinks out of glasses at the Harrison Avenue Tavern by Mr. Gernis and by the bartenders. I don't have any idea how many glasses I drank. I had never been refused and never had any difficulty. I have my checks cashed there along with other people. That is a service which the defendants give to people working in that neighborhood. They make no charge for cashing checks. I have never seen any colored people served out of a glass in the tavern; I have seen them served out of a bottle. I never had any difficulty whatsoever, in being able to buy a glass of beer, or a bottle of beer, or a drink of whiskey in the tavern before December 7, 1946.

The testimony of the plaintiff relative to the foregoing transactions, which he said occurred on December 7 and 9 of 1946, is not corroborated by any evidence in the case.

Forrest Dahl testified: I was in the tavern about 3:30 o'clock in the afternoon, but I do not remember the date. I know the defendants Gernis and Dorr by sight; I do not know if they were there or not. I happened to look toward Denny and he held up some money and the bartender shook his head. I don't know who he was; I could not hear what he asked for, because I was not close enough to hear. I was with Mike, the boss in the plant; I think Sands came in.

James Sands testified: On January 24, 1947, on a Friday night about 3:30 or 4:00 o'clock in the afternoon, I was in the tavern and I saw Denny there. I was at the very end of the bar. I saw Denny walk in and he went to the bar about four or five feet down from me. Denny asked for something, I cannot swear what it was. I saw the bartender shake his head, "no," and Denny turned around and walked out. I

believe I saw both Gernis and Dorr at the bar that afternoon. Denny was coming to work on the night shift. He rode from the shop with us. He did not talk to me on that occasion about going in there for the purpose of seeing whether he could be served anything. I did not go with him on any other occasion to see whether he would be served or not.

Mrs. Nina Sands, wife of James Sands, testified: On January 24, 1947, I was in the tavern about 3:30 or 4:00 o'clock in the afternoon. I saw Mr. Denny get out of the car. I was with my husband at the time, as I had come to meet him. I went in the tavern first, and my husband followed me in. Denny was standing at the bar; there were two persons between Mr. Denny and myself. I heard Mr. Denny say to the bartender in the brown suit that he wanted a beer. He said, "no." That was the only conversation that took place between the two of them. Mr. Denny turned around and walked out.

Excepting the plaintiff's testimony in rebuttal to the evidence introduced by the defendants, no other evidence introduced by the plaintiff appears in the record.

The defendant, Gernis, testified: I was not in the tavern on December 9, 1946, at the time testified to by the plaintiff. One day early in December about 9:00 or 9:30 o'clock at night, I don't remember the date, Denny came in the tavern and asked me for a drink. I was behind the bar and he looked to me like he was pretty angry. He said, "I want a drink." He did not say what kind of a drink. I said, "Denny you have enough; you should go home." He said, "Am I going to get a drink or not?" I said, "Denny, you got enough." He said, "I'll get you, you son of a bitch." Then he turned around and walked toward the door. When he got between the door and the screen door, he mentioned something which I could not understand, slammed the door and knocked his fist against the glass.

Gernis further testified: During the morning of December 7, 1946, I was behind the bar and Holm was with me: Denny came in and I looked at him. His eyes looked terrible; he was kind of drunk. His eyes were bloodshot, and he looked like a drunk to me. He was not exactly staggering. He said, "I want a drink." I said, "No, Denny, you have got plenty." I walked in the back room and he followed me where he said, "Are you going to give me a drink?" I said, "No, I told you no." This was the first time Denny ever threatened me. I was afraid of him. Then he came to the bar and said something which I do not know. Then he went to the telephone and grabbed it from the wall and tried to jerk the telephone wire off. He did not put a nickel in the telephone box, slammed the telephone against the wall. Then he slammed the door and walked out. Denny has been in the tavern on other occasions, and I have served him personally out of a glass and out of a bottle. I have never told my bartenders not to serve a colored person out of a glass, nor has Dorr ever done so to the best of my knowledge. I have never refused Denny a glass of beer, because he is a colored man. We serve everybody. Most of our colored customers buy bottled beer and take it out of the tavern; some drink out of glasses some take it out in bottles.

Wayne E. Undine testified: I am a cost accountant. I am acquainted with the defendants and know that they operate the Harrison Avenue Tavern. I don't know Julius Denny personally; I know him when I see him. I saw him one evening early in December in the tavern. I was walking out the door, and I heard Denny say, apparently to William, "I'll get you, you son of a bitch." That is the only reason I noticed it, and I turned around and took a look at him and walked out. I was working at the time. I have been employed for six years at Sundstrand Machine Tool Company. I am married and have a family.

On cross-examination Undine testified: I don't know what day that was. In the evenings when I work late, I run in and as often as once or twice. I sometimes drop into the tavern for a drink, sometimes for a sandwich. This was shortly after 9:30 or 10:00 in the evening. That would be a mere estimate, I didn't look at the clock. I was in the tavern about 10 or 15 minutes. Bill Gernis was in the tavern that evening. I first noticed Mr. Denny as I started to walk out of the door. I would not have noticed him except for the profanity that I heard. I turned around when I heard the profanity. There were about 15 or 20 people there that evening. I did not pay any attention how many were at the bar. I don't know how close I was to the door when I heard somebody swear. I did not have the door open. I don't believe I was reaching for the door. I had my back to the man. I heard some one say, ''I'll get you, you son of a bitch.'' The voice came from behind me. Then I turned and took a look. I took a good enough look to see who it was. I saw Denny. He was standing at the bar toward the front end of the bar; I don't believe there were other men standing close to him at the bar then. I don't remember how he was dressed. It was not that important to me. I have seen Denny there before; that is the reason I remember him. I did not hear Gernis say anything. I did not hear any previous conversation. I was sitting at the bar away from the door. I probably saw Denny as I started to walk out, but it didn't register. I didn't notice him until I heard the expression. Until I heard something and turned around, I had not noticed Denny at all. I left the tavern immediately after hearing the expression. I didn't hear Gernis say one word. Denny was facing the bar when I heard this remark. Denny was facing Gernis. I didn't notice anyone in the tavern turn around and look, but I did notice Denny; his expression was quite unusual. I was not looking at Denny

when I heard his voice. The voice came slightly behind me and to my left. I still buy sandwiches and beer at the Harrison Avenue Tavern. I am a good customer there. On redirect examination, Undine testified, When I heard this remark, I would say I was in the neighborhood of three or four feet from Denny.

Herbert Holm, one of the bartenders, testified: I and the defendant, Gernis, were in the tavern on December 7, 1946, when the plaintiff, Denny, came in with two other colored men. Denny asked Gernis if he could have a drink and Gernis told him that he had had enough to drink. Then Denny asked me for a drink, and I said that he had had enough; if Gernis told him that he had enough, I could not serve him. Denny went to the telephone and slammed the receiver down; he slammed the door as he went out. I never told Denny that I could not serve him out of a glass because my employers had told me not to serve beer in glasses to colored persons. It appears that Denny had enough on that morning. He did not stagger and I did not notice if his hands trembled. Holm testified that he was not in the tavern on December 9, or on January 24, when Denny allegedly asked for beer in a glass.

The bartender, Corbin, testified: I go to work at 2:30 in the afternoon and remain in the tavern until quarter to one in the morning. The beer is kept in barrels in the basement; it is necessary to go down in the basement to tap the beer. I remember a time early in December when Denny came in the tavern with two other men. I was alone (behind the bar) when these men came in. I do not remember the date. Denny asked for a glass of beer and I told him he could have a bottle of beer. There was no beer on tap. I did not tell him I could not serve beer out of a glass to him, because he is a colored person. I have not been instructed by either of the owners of the tavern not to serve liquor in glasses to colored people. I

do not know how many people were in the tavern at the time. It is possible there were ten or fifteen people present. I did not serve the other two colored men; they did not take anything. They ordered glasses of beer, but I did not have any on tap. I do not know how long before the men came in, that I had run out of tap beer. It could have been half an hour. It is possible there were men standing at the bar drinking draft beer, but I did not have it then. When the boss came in, he tapped it for me. I do not know how long it was before he came in. I have never tapped beer since I have been working for the boss. There was no commotion when, or after these men came in. They wanted a glass of beer, so they went out. I have served colored people a glass of beer when the other fellow owned the tavern, and I have served them since I worked for these two gentlemen.

The defendant, Edward C. Dorr, testified: Denny came in the tavern on December 9, while two other men were there. I returned to the tavern about 7:30 or 8:00 o'clock p. m. We had no beer on tap at that time. I saw that Corbin was pretty busy, so I stepped up behind the bar to help him, and that is when I heard him speak to Denny and the two other colored men. I waited on a few customers who were demanding service first, and then I went immediately downstairs and tapped a keg of beer. It took probably three minutes. When I returned, the colored men had left. I never instructed any of my employees to discriminate against colored people. I have never ordered them to refrain from selling colored people anything they had to drink out of a glass. It is not customary in our business for one of the owners to always tap the beer, but Corbin is quite clumsy and my box is quite small. We pile it full of beer and he could not handle it, so generally when he is working, we tap the beer.

Arne Larson testified: I know Denny. I worked with him at the Gunite Foundries for about 12 years. I have known Gernis and Dorr ever since they bought the Harrison Avenue Tavern. I have been in the tavern when Denny was there. I cannot tell you the exact date. If I remember, Mr. Fisher and Hal—I don't know his last name—were with me at that time. I was in the tavern; these two guys and Denny came in and ordered a quart of beer and a half pint of whiskey. He bought this and a bottle of beer and went to cash his check and Bill says he did not have any money, which was true, because I could not get my own check cashed. Denny needed forty-one cents, so I gave him forty-one cents. It was raining and Denny asked if somebody was there with a car and Hal said, "sure I'll take him back." I said, "I'll buy a drink before we go." We had a bottle of beer then before us, that included Denny. Denny was served a drink of whiskey in a glass at that time and place in Harrison Avenue Tavern. I have not seen him there on any other occasion that I remember. On cross-examination Larson testified: The occasion was just a little before Christmas and I cannot give a more definite date. It was about 9:30 or 10:00 at night.

Asa Fisher testified: I was present in the fall of 1946, with Arne Larson and Elwood Holman when Julius Denny came into the Harrison Avenue Tavern. We were in there and Denny got a drink of whiskey and a bottle of beer, I think it was, and he wanted to cash his check and Bill did not have enough money to cash it. Arne gave Denny some of his money to finish paying for the drink. Denny had a drink out of a glass.

On cross-examination Fisher testified: I do not recall the date; it was sometime in December, about 10:00 in the evening. It was before Christmas, I think. I cannot say for sure that I was in the tavern when

Denny came in. I work at Spengler-Loomis Manufacturing Company. I have worked there about two and a half years. I know Gernis and I know Dorr. I have gone in and out of this tavern for the past couple of years. I have never seen Denny in there on any other occasion than the one I am talking about. On that particular occasion he had a shot; I do not know what brand it was, but I think a bottle of beer. We were sitting along the side of the bar.

On rebuttal, the plaintiff testified: On the morning of December 7, 1946, I was in the Harrison Avenue Tavern. I did not go to the telephone; I did not grab it off the hook. I did not follow Gernis back to the back room. I went to work that day on December 7, 1946, and reported for work about five minutes to eight. I worked until noon that day, Saturday. I did not, on a previous occasion prior to December 7, in the evening, come to the Harrison Tavern and address Gernis requesting a drink and then say to him,— "I'll get even with you, you son of a bitch," or words to that effect. I have never sworn at either Gernis or Dorr. On December 9, 1946, I went to work at 4:00 p. m. and worked until 2:30 in the morning. On January 24, 1947, I went to work at 3:30. I was waiting for Dahl and he was to take me down to the tavern. I reported to work that day at five minutes to four and worked until 2:30 in the morning of January 25. Mr. Gernis did not, at any time, tell me in the Harrison Tavern, "you have enough;" nor did Holm say to me that he would not serve me because I had enough; nor did Holm say that he would not serve me as long as the boss would not serve me.

The testimony of the plaintiff and the defendant, Gernis, and the bartender and Holm, and the question whether the plaintiff was denied the purchase of a glass of beer in the tavern on December 7, 1946, by Gernis and Holm, on account of his color, is in sharp conflict. The testimony of the plaintiff that he held up

a half dollar in the tavern on January 24, 1947, and asked for a glass of beer, which was refused him by the bartender there, is in general corroborated by the witnesses, Dahl, Sands and Mrs. Nina Sands. The evidence of these witnesses is opposed by the denial of the defendants and the bartenders that none of them ever refused to sell the plaintiff beer by the glass. Whether or not there was beer on tap in the tavern on December 9, 1946, when the plaintiff testified he was denied the purchase of a glass of beer, and the reason for such denial, was a question of fact for the determination of the jury.

The appellants claim that plaintiff's given instruction No. 4, is erroneous in that it contains the phrase that the "Defendants by themselves, or through their agents and servants denied the sale of a glass of beer on one or more occasions, etc." We find no merit in this contention, as the statute fully covers this situation.

The appellants also contend that the court erred in modifying their instruction No. 7. This instruction is relative to the burden of proof, and contains this sentence, "If the evidence is evenly balanced on this issue, or if you believe from a preponderance of the evidence, etc." The court struck out the words, "If the evidence is evenly balanced on this issue." This form of instruction has been frequently criticized, and in the case of *Healy v. New York Cent. R. Co.*, 326 Ill. App. 556, this court held that such an instruction should not be given. The trial court properly modified the instruction. The jury was properly instructed by the court, as to the law applicable to the case.

The question of the credibility of the witnesses was for the determination of the jury who had the opportunity to observe the conduct and demeanor of the witnesses, their fairness, or lack thereof, and to weigh and determine the witnesses' interest in the re-

sult of the trial. Where the evidence is in sharp conflict, in cases of this kind, a reviewing court will not find the verdict against the manifest weight of the evidence, unless it is clearly so, or it appears there has been injustice or unfairness during the trial.

The case was fairly presented to the jury and the judgment appealed from is affirmed.

*Affirmed.*